IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
JONESBORO DIVISION

HEATH ADKISSON, LORI ADKISSON,
RYAN BRASWELL, MELISSA BRASWELL,
OLIVER COPPEDGE, TRACY COPPEDGE,
GEORGE A. HALE III, STEPHANIE HALE,
JEFF LANGSTON, AND MISSY LANGSTON                          PLAINTIFFS

v.                          Case No. 3:13-cv-00127-KGB

BLYTHEVILLE SCHOOL DISTRICT NO. 5                          DEFENDANT

## ORDER

Plaintiffs bring this action against defendant Blytheville School District No. 5 (the "BSD"), alleging through 42 U.S.C. § 1983 that the BSD violated the Equal Protection Clause and Due Process Clause of the Fourteenth Amendment and through the Arkansas Civil Rights Act ("ACRA"), Ark. Code Ann. §§ 16-123-105 and -107, that the BSD violated the Arkansas Constitution by declaring an exemption to interdistrict school transfers under the Arkansas Public School Choice Act of 2013 (the "2013 Act") (Dkt. No. 32). As relief, plaintiffs request a declaration and permanent injunction against the BSD, as well as damages allegedly stemming from their due process claims and punitive damages for the BSD's purportedly race-based conduct (Dkt. Nos. 32, 75).

Before the Court are plaintiffs' motion for partial summary judgment (Dkt. No. 50) and motion *in limine* (Dkt. No. 77) and the BSD's motion for leave to file first amended answer to amended and supplemental complaint (Dkt. No. 56) and counter-motion for summary judgment (Dkt. No. 59). For the following reasons, the Court denies plaintiffs' motion for partial summary judgment (Dkt. No. 50) and grants the BSD's counter-motion for summary judgment (Dkt. No.

59).  Plaintiffs' motion *in limine* and the BSD's motion for leave to file first amended answer to amended and supplemental complaint are denied as moot (Dkt. Nos. 77, 56).

## I.        Statutory Background

Generally, the 2013 Act requires each school district in Arkansas to participate in the public school choice program.  The 2013 Act contains two limitations as set forth in Arkansas Code Annotated § 6-18-1906(a) and (b) that may apply to a resident district to restrict or defeat a student's right to transfer to a nonresident district.  Plaintiffs contend that only the second limitation is at issue here.

The first limitation, as set forth in Arkansas Code Annotated § 6-18-1906(a), provides: "If the provisions of [the 2013 Act] conflict with a provision of an enforceable desegregation court order or a district's court-approved desegregation plan regarding the effects of past racial segregation in student assignment, the provisions of the order or plan shall govern" ("Limitation (a)").  Plaintiffs characterize the second limitation as an "opt-out" provision set forth in Arkansas Code Annotated § 6-18-1906(b) ("Limitation (b)").  Limitation (b) states as follows:

(b)    (1)    A school district annually may declare an exemption under this section if the school district is subject to the desegregation order or mandate of a federal court or agency remedying the effects of past racial segregation.

(2)    (A)    An exemption declared by a board of directors under this subsection is irrevocable for one (1) year from the date the school district notifies the Department of Education of the declaration of exemption.

(B)    After each year of exemption, the board of directors may elect to participate in public school choice under this section if the school district's participation does not conflict with the school district's federal court-ordered desegregation program.

(3)    A school district shall notify the department by April 1 if in the next school year the school district intends to:

(A)    Declare an exemption under this section; or

> (B)      Resume participation after a period of exemption.

Ark. Code Ann. § 6-18-1906(b).

The 2013 Act requires a school district to notify the Arkansas Department of Education ("ADE") "by April 1 if in the next school year the school district intends to" declare an exemption or resume participation in the 2013 Act after a period of exemption. *Id.* § 6-18-1906(b)(3). On May 1, 2013, the ADE released a memo that stated:

> As noted above, Act 1227 did not become effective until April 16, 2013. However, the Act sets April 1 as the date by which a school district must notify the ADE of its intention to declare an exemption for participation in public school choice under the Act. The ADE will not attempt to reestablish a deadline that is set in law. However, so school districts and the ADE can properly administer all aspects of Act 1227 in an orderly fashion and so that parents, students, patrons and school district leaders may be aware of those school districts which are subject to desegregation orders or federal agency mandates remedying the effects of past racial segregation, the ADE requests that school districts notify the ADE of any exemption by **<u>Friday, May 17, 2013</u>**.

(Dkt. No. 60, at 14).

Further, under the 2013 Act, the parents of students seeking to transfer to attend a school in a nonresident district must submit an application to the nonresident district with a copy to the resident district on a form approved by the ADE and postmarked no later than June 1 of the year in which the student seeks to begin the fall semester at the nonresident district. Ark. Code Ann. § 6-18-1905(a). By August 1 of the school year in which the student seeks to enroll in a nonresident district, the superintendent of the nonresident district shall notify the parent and the resident district in writing as to whether the student's application has been accepted or rejected. *Id.* § 6-18-1905(b)(1). If the application is accepted, the notification letter must include the deadline by which the student shall enroll in the nonresident district, after which the acceptance is null, and instructions for the renewal procedure established by the nonresident district. *Id.* § 6-

18-1905(b)(3).  If the application is rejected, the notification letter shall state the reason for the rejection.  *Id.* § 6-18-1905(b)(2).

Students whose applications for transfer are rejected by the nonresident district may request a hearing before the Arkansas State Board of Education to reconsider the transfer.  *Id.* § 6-18-1907(b)(1).  The 2013 Act requires that a student request in writing an appeal hearing within 10 days after the student or student's parent receives the notification letter.  *Id.* § 6-18-1907(b)(2)(A).  "As part of the review process, the parent may submit supporting documentation that the transfer would be in the best educational, social, or psychological interest of the student."  *Id.* § 6-18-1907(b)(2)(B).  The State Board of Education may overturn the nonresident district's decision on appeal and, if it does so, must notify "the parent, the nonresident district, and the resident district of the basis for the state board's decision."  *Id.* § 6-18-1907(b)(3).

## II.     Factual Background

Unless otherwise noted and specified by citation, the following facts are undisputed and taken from plaintiffs' statement of undisputed material facts in support of motion for summary judgment (Dkt. No. 52), the BSD's response to plaintiffs' statement of undisputed material facts (Dkt. No. 61), the BSD's statement of material facts as to which no genuine disputes exist to be tried (Dkt. No. 62), and plaintiffs' response to the BSD's statement of undisputed material facts (Dkt. No. 68).

As of April 29, 2013, plaintiffs Health and Lori Adkisson, Ryan and Melissa Braswell, Oliver and Tracy Coppedge, George and Stephanie Hale, and Jeff and Missy Langston were residents of and had children who resided in the BSD.  Between April 19, 2013, and April 26, 2013, each plaintiff submitted an application on behalf of one of their children for transfer from the BSD to a nonresident district under the 2013 Act for the school year beginning in fall of

2013.  Each child for whom a transfer was sought is Caucasian.  The BSD received plaintiffs' applications between April 22, 2013, and April 26, 2013.

Although absent from their summary judgment filings, plaintiffs state in their trial brief that the BSD scheduled a special meeting of its Board of Directors for April 29, 2013, giving notice of the meeting only to certain media outlets (Dkt. No. 75, at 1).  At that special meeting, the BSD's Board of Education adopted a resolution by a vote of six to zero to declare the BSD exempt under the 2013 Act.  Richard Atwill, Superintendent of the BSD, informed the ADE of the resolution and exemption by letter dated May 9, 2013, received by the ADE on May 14, 2013.  On March 31, 2014, the BSD renewed its claim of exemption under the 2013 Act.

The BSD declared the exemption in April 2013 based in part on *Franklin v. Board of Education of Blytheville School District No. 5*, U.S.D.C. No. J-71-C-35.  In *Franklin*, African American parents filed suit against the BSD seeking to enjoin the BSD from continuing to operate a dual school system and requiring it to implement a unitary school system.  On August 19, 1971, the district court in *Franklin* entered an order approving the BSD's desegregation plan, with the exception of certain identified issues, ending its "freedom of choice" plan that was previously rejected by the U.S. Department of Health and Welfare ("HEW") and Department of Justice ("DOJ") (Dkt. No. 52-1, at 24-25).  On May 31, 1973, the HEW sent a letter to the ADE advising that the BSD "must modify its plan as may be ordered by the court to remain in compliance" (*Id.* at 38).  On June 21, 1973, the district court entered an order closing the case but retaining jurisdiction.  The district court stated in this order that,

> [o]n the basis of correspondence with counsel for the parties, the Court concludes that issues reserved in the Court's order [approving the BSD's desegregation plan] are no longer a subject of controversy.  There being no pending issues in this preceding, it is ordered that this case be, and it is hereby, closed but that the Court retain jurisdiction of this cause and of the parties hereto for necessary and appropriate purposes.

(*Id.* at 26).  On December 7, 1978, the district court entered an order dismissing the case because, since closing it, "the Court ha[d] received no further communication concerning this case" (*Id.* at 27).  Three days later, on December 9, 1978, plaintiffs' counsel sent the district judge a letter that stated:

> The Court sua sponte closed this case.  I am writing to remind the Court that there is no finding by the Court that a unitary school system has been achieved . . . .
>
> With respect to the establishment of a unitary school system, I think the obligation of the Court is to make some further inquiry and to also insure that faculty and staff desegregation principles are clearly expressed.
>
> I am bringing these matters to the Court's attention in the hope that the Court will rescind its order and judgment filed December 7 and substitute an order requiring the defendants to provide the Court something in the nature of a comprehensive final report which relates to students, staff, programs and facilities.

(*Id.* at 28).

All students in the BSD attend the same public schools.  In 2009, the Arkansas State Board of Education approved an open-enrollment charter school—KIPP Delta Academy ("KIPP").  KIPP educates about 250 students, most of whom come from the BSD and the majority of whom are African American or other minorities.  BSD did not attempt to block transfers of any children, regardless of race, to KIPP on the basis of any alleged desegregation order or remedy.

### III.    Legal Standard

Summary judgment is proper if the evidence, when viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue of material fact and that the defendant is entitled to entry of judgment as a matter of law.  Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A factual dispute is genuine if the evidence could cause a reasonable jury to return a verdict for either party.  *Miner v. Local 373*, 513 F.3d 854, 860 (8th Cir. 2008).

"The mere existence of a factual dispute is insufficient alone to bar summary judgment; rather, the dispute must be outcome determinative under the prevailing law." *Holloway v. Pigman*, 884 F.2d 365, 366 (8th Cir. 1989). However, parties opposing a summary judgment motion may not rest merely upon the allegations in their pleadings. *Buford v. Tremayne*, 747 F.2d 445, 447 (8th Cir. 1984). The initial burden is on the moving party to demonstrate the absence of a genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 323. The burden then shifts to the nonmoving party to establish that there is a genuine issue to be determined at trial. *Prudential Ins. Co. v. Hinkel*, 121 F.3d 364, 366 (8th Cir. 2008). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (citation omitted).

## IV.   Analysis

"The standard for granting a permanent injunction is essentially the same as for a preliminary injunction, except that to obtain a permanent injunction the movant must attain success on the merits." *See Bank One, N.A. v. Guttau*, 190 F.3d 844, 847 (8th Cir. 1999) (citing *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 546 n.12 (1987)). Accordingly, plaintiffs must satisfy the *Dataphase* factors:  (1) plaintiffs must demonstrate their likelihood of success on the merits; (2) plaintiffs must establish the threat of irreparable harm; (3) plaintiffs must satisfy the balance between the harm to the movant and the injury that granting an injunction would cause other interested parties; and (4) plaintiffs must address how granting the injunctive relief requested impacts the public interest. *See Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981) (en banc).

### A.      Success On The Merits

Before analyzing success on the merits, the Court notes that the parties cross-move for summary judgment on plaintiffs' equal protection claims, while only the BSD moves for summary judgment on plaintiffs' due process claims.

### 1.      Equal Protection Claims

The Equal Protection Clause of the Fourteenth Amendment forbids a state to "deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1. The Arkansas Constitution also secures the right to equality before the law and the right not to be deprived of any right, privilege, or immunity on account of race. Ark. Const. art. 2, § 3.  Under 42 U.S.C. § 1983 and the ACRA, violations of these constitutional provisions give rise to a cause of action for legal and equitable relief.  The Court may look to decisions under § 1983 for guidance on plaintiffs' ACRA claims.  Ark. Code Ann. § 16-123-105(c).  Accordingly, the Court analyzes plaintiffs' § 1983 and ACRA equal protection claims together.

Plaintiffs argue that the BSD's adoption of the resolution exempting the BSD from the 2013 Act had a disparate impact on and was motivated by race, requiring the Court to review the BSD's decision under the strict-scrutiny standard.  Alternatively, plaintiffs argue that, even if the Court determines that the BSD's adoption of the resolution did not have a disparate impact on or was not motivated by race, the BSD had no rational basis to make its decision.

To show a race-based violation of the Equal Protection Clause based on a facially neutral state action, a claimant must demonstrate that the action "had a discriminatory effect and that it was motivated by a discriminatory purpose."  *United States v. Armstrong*, 517 U.S. 456, 465 (1996); *see Village of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 264-65 (1977) ("[O]fficial action will not be held unconstitutional solely because it results in a racially

disproportionate impact. . . .   Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." (citing *Washington v. Davis*, 426 U.S. 229 (1976))); *Palmer v. Thompson*, 403 U.S. 217, 224-25 (1971) ("[N]o case in this Court has held that a legislative act may violate equal protection solely because of the motivations of the men who voted for it. . . .   It is difficult or impossible for any court to determine the 'sole' or 'dominant' motivation behind the choices of a group of legislators.   Furthermore, there is an element of futility in a judicial attempt to invalidate a law because of the bad motives of its supporters.   If the law is struck down for this reason, rather than because of its facial content or effect, it would presumably be valid as soon as the legislature or relevant governing body repassed it for different reasons.").   If plaintiffs show that the BSD's decision had a discriminatory effect and that race was a motivating factor in the BSD's decision, then "judicial deference is no longer justified," which means the Court would apply strict scrutiny to the BSD's decision.   *See Village of Arlington Heights*, 429 U.S. at 265-66; *see also Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 282 (1979).   For the following reasons, this Court determines strict scrutiny is not required here.

### a.       Discriminatory Effect

To establish a discriminatory effect on race, plaintiffs must show that the BSD's decision resulted in similarly situated individuals of different races being treated differently.   *See Armstrong*, 517 U.S. at 465.   Based on the record viewed in the light most favorable to plaintiffs, a reasonable person would conclude that the BSD's adoption of the resolution did not result in a racially disparate effect.

Plaintiffs' complaint admits that the BSD's adoption of the resolution prevented all students, regardless of race, from transferring under the 2013 Act (*see* Dkt. No. 32, at 21

("Blytheville School District has denied each and every resident of the Blytheville School District, including plaintiffs and their children, the benefits, rights and privileges of the school choice program under the Act.")).   Plaintiffs instead appear to argue that the Arkansas State Board of Education's approval of KIPP's application to open in Blytheville, and the BSD's failure to block transfers of any children, regardless of race, to KIPP on the basis of any alleged desegregation order or remedy, shows that the BSD treated Caucasian and African American students differently because an "overwhelming majority of children at KIPP in Blytheville are black" (Dkt. No. 51, at 9).   However, based on the record before the Court, KIPP is an open-enrollment public charter school that must admit all applicants who apply, unless there are more applicants than spaces, in which case KIPP must fill spaces according to random, anonymous lottery.   The fact that a majority of students who transferred from the majority-African American BSD school district were in fact African American is not surprising and does not show that the BSD's failure to object based on a past desegregation order or mandate to the KIPP open-enrollment public charter school's operation or to student transfers to KIPP resulted in a discriminatory effect.   All BSD students, regardless of race, had an equal opportunity to transfer to KIPP, just as no BSD students could transfer under the 2013 Act.

The Court notes that, in their trial brief but not in their filings regarding summary judgment, plaintiffs argue that the BSD permitted African American but not Caucasian students to transfer out of the district (Dkt. No. 75, at 10).   Plaintiffs cite no support in the record for this argument, and they do not contend African American students were permitted to transfer out of the district under the 2013 Act.   To the extent this argument is included in plaintiffs' trial brief based on their interpretation of the superintendent's testimony at the preliminary injunction hearing, for the reasons explained below, this Court rejects plaintiffs' interpretation of that

testimony.  Further, the superintendent was asked at the preliminary injunction hearing whether he had been involved with "legal transfers" of students in or out of the BSD as superintendent, and he said he had not (Dkt. No. 35, at 89:13-18).  The Court understands the parties' use of "legal transfers" to refer to transfers under Act 762 of 1987, Arkansas Code Annotated § 6-18-317(a).  That statute prohibits student transfers if either the resident or receiving district has ever been under a desegregation order, and the Eighth Circuit upheld that statute notwithstanding constitutional challenges on equal protection grounds in *Edgerson on Behalf of Edgerson v. Clinton*, 86 F.3d 833 (8th Cir. 1996).  To the extent this argument refers to transfers of students to KIPP, for all of the reasons set forth in this Order, the Court rejects transfers of students to KIPP as evidence of disparate impact.

To the extent that plaintiffs could argue that the disparate impact of the BSD's decision on residents of the BSD as compared to other Arkansas citizens also somehow implicates race, plaintiffs fail to explain how or to provide evidence that such is the case.  *See Armstrong*, 517 U.S. at 468 (holding that to show a criminal prosecution constituted an equal protection violation there must be "some evidence that similarly situated defendants of other races could have been prosecuted, but were not"); *Edgerson*, 86 F.3d at 837 ("Edgerson must present clear proof of an interdistrict violation and clearly explain the extent of the interdistrict effects" and "demonstrate the interdistrict segregative effects are current.").

Lastly, this Court rejects plaintiffs' argument that *Parents Involved in Community Schools v. Seattle School District No. 1*, 551 U.S. 701 (2007), controls and requires this Court to apply strict scrutiny.  Unlike the facts at issue in *Parents Involved*, there is no evidence that the BSD, by adopting the resolution to exempt itself from the 2013 Act, distributed burdens or benefits on the basis of individual racial classifications.  *See Parents Involved*, 551 U.S. at 720.

The instant case does not involve student assignment plans that require the BSD to consider an individual student's race to determine which school that student may attend.  Here, the BSD's adopting the resolution exempting itself from the 2013 Act impacted Caucasian and African American students alike.  Further, in *Parents Involved*, the Court discussed, and there was proof regarding, an effect or disparate impact.  551 U.S. at 733-34.  For all of these reasons, there is no evidence of discriminatory effect here.

### b.    Discriminatory Purpose

To prove that race motivated the BSD's decision, plaintiffs must show that the BSD "selected or reaffirmed a particular course of action at least in part 'because of' not merely 'in spite of' its adverse effects upon an identifiable group." *United States v. Farmer*, 73 F.3d 836, 841 (8th Cir. 1996) (quoting *United States v. Clary*, 34 F.3d 709, 712 (8th Cir. 1994)). "'Discriminatory purpose,' however, implies more than intent as volition or intent as awareness of consequences." *Feeney*, 442 U.S. at 279.  To discern the purposes underlying facially neutral policies where reliable evidence of subjective intentions is unobtainable, courts consider "the degree, inevitability, and foreseeability of any disproportionate impact as well as the alternatives reasonably available." *Id.* at 283 (Marshall, J., dissenting).  Under traditional equal-protection analysis, "even if a neutral law has a disproportionately adverse impact upon a racial minority, it is unconstitutional . . . only if that impact can be traced to a discriminatory purpose." *Id.* at 272 (majority opinion).  Based on the record viewed in the light most favorable to plaintiffs, a reasonable person would conclude that the BSD's adoption of the resolution was not motivated by discriminatory purpose.

Plaintiffs argue that the BSD's decision was motivated by race by citing the testimony of the BSD's superintendent and the BSD's purported approval of KIPP.  According to plaintiffs,

the superintendent's testimony shows that the BSD acted on the basis of *Franklin* and the superintendent's understanding that *Franklin* meant that "white students were not allowed to transfer out and black students were not allowed to transfer in" (Dkt. No. 51, at 5, 7, 8-9).  As an initial matter, the Court agrees with the BSD's response that in the excerpt of testimony referenced by plaintiffs the superintendent "was speaking to the manner in which the previous school choice statute was worded and how it was implemented," not the requirements of *Franklin* or the 2013 Act (Dkt. No. 60, at 9-10).  The testimony quoted by plaintiffs in their moving papers is from this exchange between plaintiffs' counsel, who asked the questions, and the superintendent, who responded:

Q.     Why did you recommend that the Blytheville School District opt out of the 2013 Act notwithstanding what you read about the April 1st deadline?

A.     It was my opinion that the district was still part of a desegregation order.

Q.     How did you form that opinion?

A.     By looking back over some archival data that we have in the district from past cases and from some law history.

Q.     So what archival data did you look over?  Is it pretty much the same as what has been attached to some of the pleadings that the Blytheville School District has filed here?

A.     *Franklin, et al*, yes.

Q.     All right.  Good.  When did you look over that archival information?

A.     When?

Q.     Yes.

A.     I don't recall the date specifically.

Q.     Well, was it in 2013?

A.     I looked over it a bunch in 2013, a bunch in 2012.

Q.     Why did you look over it in 2012?

A.     In the past, the State of Arkansas had school choice, but due to the desegregation order, white students—we couldn't upset the racial balance. As the old law was, we couldn't upset the racial balance of the school district, therefore, white students were not allowed to transfer out and black students were not allowed to transfer in.  Black students could transfer out, white students could transfer in, but—so I tried to keep up on the information from the past to watch the trends.

Q.     When did you first begin to look at that information from the past to keep up with it?

A.     2009, when I became superintendent.

(Dkt. No. 35, at 61:19-62:24).   The Court declines to find that the sole passage of the superintendent's testimony quoted by plaintiffs establishes as a matter of law that the BSD's approval of the resolution on the 2013 Act was motivated by race.

This Court also declines to determine that, as a matter of law, the Arkansas State Board of Education's approval of KIPP; the BSD's failure to block transfers of any children, regardless of race, to KIPP on the basis of any alleged desegregation order or remedy; and the existence of KIPP's majority-African American student body shows that the BSD's adoption of the resolution on the 2013 Act was motivated by race.  The BSD's role in the approval of KIPP's application to operate is governed by an entirely different review process than the 2013 Act.  The parties here agree that the Arkansas State Board of Education approved KIPP's application to open in Blytheville, not the BSD, although the BSD by statute is to have some input in that decision. Arkansas Code Annotated § 6-23-106 specifies the review process the BSD, along with the applicants for a public charter school and the authorizer, are to engage in when evaluating a public charter school's impact on school desegregation efforts.  There is some evidence before the Court that discussions occurred at some time between the superintendent and ADE representatives regarding these issues, although the evidence is not well developed by either side

to this dispute (Dkt. No. 35, at 63:9-65:12; 75:23-77:2).  The inquiry called for by Arkansas Code Annotated § 6-23-106 is different from what is required under the 2013 Act for the BSD to declare an exemption.

The parties have presented little evidence regarding the information on which the BSD relied when deciding whether to adopt the resolution, aside from the written resolution itself issued by the BSD (*See* Dkt. No. 32-4).  If the Court accepts the language of the resolution as true, the BSD adopted the resolution based on its determination that the "BSD is subject to a desegregation order or mandate of a federal court or agency remedying the effects of past racial segregation" for the reasons cited in the resolution (*Id.*).  This Court is presented with whether, just because *Franklin* dealt with race, the BSD's decision that it qualified for Limitation (b) because of *Franklin* was based on a discriminatory purpose for an equal protection analysis.

Again, the phrase "[d]iscriminatory purpose . . . implies that the decisionmaker, in this case [the BSD], selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group."  *Feeney*, 422 U.S. at 279.  The Court concludes plaintiffs have not demonstrated that the BSD adopted the exemption in part because of, and not merely in spite of, race or more specifically because of the adverse effects upon an identifiable group.  Typically, proof of discriminatory intent must necessarily rely on objective factors, several of which the Supreme Court outlined in *Arlington Heights v. Metropolitan Housing Development Corp.*, 249 U.S. 252, 266 (1977).  Evidence of those objective factors is absent here.  For example, plaintiffs present no statistical data so clearly discriminatory that there is no other explanation, no history surrounding the BSD's actions that leads one to conclude discriminatory motive, and no legislative or administrative history of the BSD's resolution that leads one to that conclusion.  *See id.* at 266.  Instead, here the "legitimate

noninvidious purposes of [the BSD's resolution]"—namely to comply with the 2013 Act and the desegregation order and mandates the BSD believed it was under—"cannot be missed." *Feeney*. 422 U.S. at 275; *see United States v. Lattimore*, 974 F.2d 971, 975 (8th Cir. 1992) (finding that the "legitimate noninvidious purposes" of the Sentencing Guidelines' harsh sentences for crack offenses could not be missed).

In sum, the Court determines that, based on the record viewed in the light most favorable to plaintiffs, the BSD's adoption of the resolution did not result in a racially disparate impact and was not motivated by race for purposes of an equal protection analysis.   As discussed above, both discriminatory effect and motivation by a discriminatory purpose are necessary for this Court to apply strict scrutiny, and the Court finds neither here.   As a matter of law, strict scrutiny does not apply.

### c.   Rational Basis

Plaintiffs appear to argue that, even if the ability to participate in the 2013 Act is not a suspect classification or fundamental right, the BSD's decision disparately impacted residents of the BSD as compared to other Arkansas citizens and thus rational-basis review applies (*see* Dkt. No. 51, 13-14 (citing *Allegheny Pittsburgh Coal Co. v. Cnty. Comm'n of Webster Cnty.*, 488 U.S. 336 (1989)).   The BSD does not appear to dispute that rational basis applies.   Under rational-basis review, "if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose," then the challenged decision does not violate the Equal Protection Clause.   *Heller v. Doe*, 509 U.S. 312, 320 (1993).   Whether the BSD's decision survives rational-basis review is a question of law for the Court to answer.   *See Myers v. Cnty. of Orange*, 157 F.3d 66, 75 n.3 (2d Cir. 1998) ("The issue of whether the [municipal] policy has a rational basis and therefore does not violate the Equal Protection Clause . . . is a legal issue for

the court and not a factual issue for jury determination."); *Izquierdo Prieto v. Mercado Rosa*, 894 F.2d 467, 471 (1st Cir. 1990) (stating that, under rational basis review, rationality is "a question of law for the judge—not the jury—to determine.").

Plaintiffs next appear to argue, and the BSD does not appear to dispute, that a school district's decision to exempt itself from the 2013 Act is rationally related to a legitimate governmental purpose underlying the Act's limitations only if the Act gave the school district discretion to do so. Plaintiffs cite *Allegheny Pittsburgh Coal Company*, where the Supreme Court determined that the Webster County tax assessor's assessments of real property at 50 percent of its most recent sales price did not survive rational-basis review. 488 U.S. at 338, 345-46. Plaintiffs' property was assessed at roughly 8 to 35 times more than the appraised value of comparable neighboring property. *Id.* at 344. Although states may assign different tax burdens to different classes if those burdens and divisions are reasonable, the Court determined that the Webster County tax assessor's methods had no rational basis because it was not authorized by statute and there was no evidence that West Virginia "may have adopted a different system in practice from that specified by statute." *Id.* at 345. No West Virginia statute or practice "authorizes individual counties of the State to fashion their own substantive assessment policies independently of state statute." *Id.* The county tax assessor applied the tax laws of West Virginia on her own initiative and contrary to the guide published by the West Virginia Tax Commission, with the result being disparity in assessed value of similar property within Webster County. *Id.*

Plaintiffs argue that the BSD did not have discretion to exempt itself under the 2013 Act because the BSD cannot rationally justify defying the alleged April 1, 2013, deadline to claim an exemption for the 2013-2014 school year or using the *Franklin* case to support its claim of being

subject to a federal desegregation order or mandate.  The Court disagrees and determines that the

BSD's decision survives rational-basis review.

First, the BSD submitted timely notice of the exemption.  The 2013 Act did not become

effective until April 16, 2013, but requires a school district to "notify the [ADE] by April 1 if in

the next school year the school district intends to" declare an exemption.  Ark. Code Ann. § 6-

18-1906(b)(3).  On May 1, 2013, the ADE released a memo that stated:

> As noted above, Act 1227 did not become effective until April 16, 2013.
> However, the Act sets April 1 as the date by which a school district must notify
> the ADE of its intention to declare an exemption for participation in public school
> choice under the Act.  The ADE will not attempt to reestablish a deadline that is
> set in law.  However, so school districts and the ADE can properly administer all
> aspects of Act 1227 in an orderly fashion and so that parents, students, patrons
> and school district leaders may be aware of those school districts which are
> subject to desegregation orders or federal agency mandates remedying the effects
> of past racial segregation, the ADE requests that school districts notify the ADE
> of any exemption by **<u>Friday, May 17, 2013</u>**.

(Dkt. No. 60, at 14).  The BSD declared its exemption on April 29, 2013, prior to the issuance

the ADE Memo.

"When the language of a statute is plain and unambiguous, there is no need to resort to

rules of statutory construction."  *Yamaha Motor Corp., U.S.A. v. Richard's Honda Yamaha*, 38

S.W.3d 356, 360 (Ark. 2001) (citation omitted).  "A statute is ambiguous where it is open to two

or more constructions, or where it is of such obscure or doubtful meaning that reasonable minds

might disagree or be uncertain as to its meaning."  *Id.* (citation omitted).  Courts should be

"hesitant to interpret a legislative act in a manner contrary to its express language unless it is

clear that a drafting error or omission has circumvented legislative intent."  *Id.* (citation omitted).

Where a statute is ambiguous, "[t]he title may only be examined for the purpose of shedding

light on the intent of the legislature."  *Baker Refrigeration Sys., Inc. v. Weiss*, 201 S.W.3d 900,

907 (Ark. 2005) (citation omitted).  Further, "the manner in which a law has been interpreted by

executive and administrative officers is to be given consideration[,] . . . will not be disregarded unless it is clearly wrong," and is "highly persuasive." *Yamaha Motor Corp, U.S.A.*, 38 S.W.3d 356, 360 (citation omitted). However, an agency's interpretation cannot overcome a statute's unambiguous interpretation. *Id.* (citation omitted).

The 2013 Act is ambiguous as to whether the April 1 deadline applies to the 2013-14 school year. On one hand, the 2013 Act could be reasonably interpreted to mean that the exemptions were not available to school districts for the 2013-14 school year because the deadline to notify the ADE of the exemption had already passed when the 2013 Act became effective. On the other hand, the 2013 Act could be reasonably interpreted to mean that the April 1 deadline did not apply to the 2013-14 school year because the Legislature required the 2013 Act to be implement in the 2013-14 school year—as made clear by its title, "Public School Choice Act of 2013"—and the availability of exemptions is a vital component of the 2013 Act, which was only to remain in effect until 2015. *See* Ark. Code Ann. §§ 6-18-1901(a), -1908. The ADE, as well as many school districts that declared exemptions, apparently adopted the latter interpretation. This is evidenced by the ADE Memo. Even though the ADE Memo post-dates the BSD's resolution, the Court considers the ADE Memo as a part of its statutory construction analysis. The Court, after considering the ADE's interpretation and finding it not "clearly wrong" and "highly persuasive," also interprets the 2013 Act such that the April 1 deadline did not apply to the 2013-14 school year.

Second, the exemption was authorized under the 2013 Act. The 2013 Act authorized a school district to exempt itself if "the school district is subject to the desegregation order or mandate of a federal court or agency remedying the effects of past racial segregation." *Id.* § 6-18-1906(b)(1). The BSD points to *Franklin*, *Harvell v. Blytheville School District*, U.S.D.C. No.

J-C-89-225, and a May 31, 1973, letter from the HEW as desegregation orders or mandates of a federal court or agency.

Black's Law Dictionary defines "subject to" as "[l]iable, subordinate, subservient, inferior, obedient to; governed or affected by; provided that; provided, answerable for." Generally, "persons subject to an injunctive order issued by a court with jurisdiction are expected to obey that decree until it is modified or reversed, even if they have proper grounds to object to the order." *Celotex Corp. v. Edwards*, 514 U.S. 300, 306 (1995).

In the school desegregation context, in 1968, the Supreme Court held that, in order to achieve constitutional compliance, a school district must comply, in good faith, with a court's desegregation order and "take whatever steps might be necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch." *Green v. Cnty. Sch. Bd. of New Kent Cnty.*, 391 U.S. 430, 437-39 (1968).  In 1976, the Supreme Court clarified that, where a defendant school district has achieved an objective of a desegregation order, the district court's remedial authority over that objective ends and that part of the injunction must be dissolved. *See Pasadena City Bd. of Educ. v. Spangler*, 427 U.S. 424, 436-37 (1976); *see also Youngblood v. Dalzell*, 925 F.2d 954, 958 (6th Cir. 1991) (same); *Morgan v. Nucci*, 831 F.2d 313, 329 (1st Cir. 1987) ("Once these goals [of the desegregation order] have been adequately reached, the district court's role in the school's personnel policies will end, and we are confident the court will recognize its responsibility to terminate the injunction.").  As later explained by the Eleventh Circuit, this is because "[t]he ultimate objective of any desegregation order is the 'restoration of state and local authorities to the control of a school system that is operating in compliance with the Constitution.'" *Manning ex rel. Manning v. Sch. Bd. of Hillsborough Cnty.*, 244 F.3d 927, 941-42 (11th Cir. 2001) (citing *Missouri v. Jenkins*, 515 U.S. 70, 89 (1995)).

With the above Supreme Court authority as guidance, on August 19, 1971, the district court entered an order approving the BSD's desegregation plan, with certain identified exceptions, ending its "freedom of choice" plan that was previously rejected by the HEW and DOJ (Dkt. No. 52-1, at 24-25). On May 31, 1973, the HEW sent a letter to the ADE advising that the BSD "must modify its plan as may be ordered by the court to remain in compliance" (*Id.* at 38). On June 21, 1973, the district court entered an order closing the case but retaining jurisdiction (*Id.* at 26). Specifically, the district court stated that,

> [o]n the basis of correspondence with counsel for the parties, the Court concludes that issues reserved in the Court's order [approving the BSD's desegregation plan] are no longer a subject of controversy. There being no pending issues in this preceding, it is ordered that this case be, and it is hereby, closed but that the Court retain jurisdiction of this cause and of the parties hereto for necessary and appropriate purposes.

(*Id.*) On December 6, 1978, the district court entered an order dismissing the case because, since closing the case, "the Court has received no further communication concerning this case" (*Id.* at 27). Three days later, on December 9, 1978, plaintiffs' counsel sent the district judge a letter that stated:

> The Court sua sponte closed this case. I am writing to remind the Court that there is no finding by the Court that a unitary school system has been achieved . . . .
>
> With respect to the establishment of a unitary school system, I think the obligation of the Court is to make some further inquiry and to also insure that faculty and staff desegregation principles are clearly expressed.
>
> I am bringing these matters to the Court's attention in the hope that the Court will rescind its order and judgment filed December 7 and substitute an order requiring the defendants to provide the Court something in the nature of a comprehensive final report which relates to students, staff, programs and facilities.

(*Id.* at 28).

Case law subsequent to *Franklin* appears to clarify a district court's obligations in a desegregation case. Specifically, a defendant school district remains subject to a desegregation

order until a court finds or declares the school district has achieved unitary status and has complied with the court's orders in good faith. *See Jenkins ex rel. Jenkins v. Missouri*, 122 F.3d 588, 599 (1997) (distinguishing *Spangler*'s holding that remedial authority over a desegregation order's objective ends after that objective is achieved because "there is no finding in this case that the [school district] ever eliminated the student assignment vestige" such that an objective was achieved); *Lockett v. Bd. of Educ. of Muscogee Cnty. Sch. Dist.*, 92 F.3d 1092, 1097-98 (11th Cir. 1996), ("The school district was subject to the 1971 court order until such time as the district court vacated that order by declaring that the school district had achieved unitary status and complied with the order in good faith. . . .  Thus to the extent that the district court ignored the school district's action after 1980, while the district was still subject to the 1971 order, the court erred."), *superseded on rehearing by*, 111 F.3d 839 ( 11th Cir. 1997).

Based on the record before the Court, the Court determines that the district court in *Franklin* never declared, implicitly or explicitly, the BSD had achieved unitary status, as required by case law at the time.  First, regarding the 1973 order closing the case, it appears that unitary status was not one of the issues "no longer subject of controversy" (Dkt. No. 52-1, at 26). Plaintiffs' counsel noted in response to the 1978 dismissal that the court, and thus the parties, had not resolved the unitary status issue (*Id.* at 26).   Conversely, it appears the district court was referencing the parties' agreement as to implementation of the desegregation order no longer being in controversy or pending in this proceeding, and that unitary status was one of the "necessary and appropriate purposes" for which the district court retained jurisdiction.  Second, regarding the 1978 dismissal order, the district court had not communicated with the parties for approximately five years when it dismissed the case; without examining the results of the BSD's implementation of the desegregation order, the district court could not have made an implicit

unitary status finding at that time.  Because no court has declared, explicitly or implicitly, that the BSD has achieved unitary status, this Court determines that the BSD's decision that it is subject to *Franklin* as well as the HEW's May 31, 1973, letter satisfies rational basis review.[1]

The Court acknowledges plaintiffs' argument that, for many years after 1978, the BSD did not operate as if it were under a desegregation order or agency mandate.  The Court views this as irrelevant to the issue of whether the district court declared, explicitly or implicitly, that the BSD achieved unitary status, and the Court views the district court's lack of a finding of unitary status as controlling.  *See Jenkins*, 122 F.3d at 599; *Lockett*, 92 F.3d at 1097-98.

The Court also rejects any suggestion by plaintiffs that the BSD was required to distinguish between intradistrict and interdistrict desegregation orders when determining whether it could adopt the resolution exempting the BSD from the 2013 Act.  The language of the 2013 Act, at least in regard to whether an exemption is available under Arkansas Code Annotated § 6-18-1906(b)(1), does not require such an analysis or differentiate between these types of desegregation orders.  For the reasons above, the BSD's adoption of the resolution was authorized by the 2013 Act and survives rational-basis review.  The Court determines that plaintiffs cannot succeed on the merits of their equal protection claim.

### 2.    Due Process Claims

The Due Process Clause of the Fourteenth Amendment forbids states to "deprive any person of life, liberty, or property, without due process of law. . . ."  U.S. Const. amend. XIV, § 1.  The Due Process Clause of the Fourteenth Amendment has two components:  namely, substantive due process and procedural due process.  *Singleton v. Cecil*, 176 F.3d 419, 424 (8th

---

[1]    Although not necessary to decide, the Court notes that *Harvel* does not appear to provide a basis for the BSD's exemption because it was not a desegregation case but a voting rights case.

Cir. 1999). Here, plaintiffs allege both a substantive and procedural due process violation. To the extent Count IV of plaintiffs' amended complaint is intended to be a state law due process claim brought under the ACRA, the Court will analyze that claim with plaintiffs' federal due process claims (Dkt. No. 32, at 25). *See* Ark. Code Ann. § 16-123-105(c).

### a.        Substantive Due Process

Substantive due process "specially protects those fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." *Singleton*, 176 F.3d at 424 (citation omitted) (internal quotation marks omitted). Citing *Washington v. Glucksberg*, plaintiffs argue that they have a liberty interest in directing the education of their children and that they were deprived of this interest by the BSD's adoption of the resolution. *See* 521 U.S. 702, 720 (1997) ("[I]n addition to the specific freedoms protected by the Bill of Rights, the 'liberty' specially protected by the Due Process Clause includes the right[] . . . to direct the education and upbringing of one's children . . . ." (citing *Meyer v. Nebraska*, 262 U.S. 390 (1923) (holding that state law prohibiting public education in the German language unconstitutionally interferes with the right of parents to control the upbringing of their children); *Pierce v. Soc'y of Sisters*, 268 U.S. 510 (1925) (holding that state law prohibiting parochial school education unconstitutionally interferes with the right of parents to control the upbringing of their children))); *see also Peter v. Wedl*, 155 F.3d 992, 1001 (8th Cir. 1998) (recognizing parents' constitutional right to choose private education for child but that "the Supreme Court has been extremely hesitant to suggest that private school students have a constitutional entitlement to the same benefits that are given to public school students by the government").

The fundamental rights and liberties plaintiffs claim here exceed that which the Supreme Court has recognized.  Plaintiffs cite no cases, and the Court has found none, holding a parent's ability to choose where his or her child is educated within the public school system is a fundamental right or liberty.  The cases cited by plaintiffs merely hold that a parent has a fundamental right to send his or her child to a private school.  Moreover, the U.S. Supreme Court, as a general rule, has been unwilling to expand the concept of substantive due process, *see, e.g., Regents of the Univ. of Mich. v. Ewing*, 474 U.S. 214, 229-30 (1985) (Powell, J., concurring), and "[t]he majority rule is that state-created employment or contract rights are generally not entitled to the protections of substantive due process," *Peterson v. North Dakota*, 240 F.Supp.2d 1055, 1063 (D.N.D. 2003).  Even if the 2013 Act could create the fundamental right or liberty that plaintiffs claim, it does not because it gives the resident district the ability to claim an exemption and leaves discretion to the nonresident district to accept or deny a student's transfer application.  Any right created by the 2013 Act is more akin to the state-created employment or contract rights that generally are not entitled to the protections of substantive due process.

Even if plaintiffs could meet the high standard to establish a substantive due process right, to prevail on their substantive due process claim, plaintiffs also must show that the challenged action "shocks the conscience."  *See Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846-47 (1998); *see also Flowers v. City of Minneapolis*, 478 F.3d 869, 873 (8th Cir. 2007).  The shocks-the-conscience test "is no calibrated yard stick," but it does point the way.  *Cnty. of Sacramento*, 523 U.S. at 847.  To satisfy it, plaintiffs must allege that the "government action complained of is sufficiently outrageous or truly irrational, that is, something more than . . . arbitrary, capricious, or in violation of state law."  *Young v. City of St. Charles*, 244 F.3d 623,

628 (8th Cir. 2001) (alteration in original) (internal quotation marks omitted).   Mere negligence will never give rise to a substantive due-process violation.   *See Daniels v. Williams*, 474 U.S. 327, 336 (1986).   Even actions that can be categorized as grossly negligent or reckless will not suffice.   *S.S. v. McMullen*, 225 F.3d 960, 964 (8th Cir. 2000).

Based on the record before the Court, viewed in the light most favorable to plaintiffs, a reasonable person would conclude that the BSD's decision was not conscience-shocking.   There is no evidence that the BSD intended to harm plaintiffs.   Instead, the BSD had the authority under the 2013 Act to adopt the challenged resolution.   The Court determines that plaintiffs cannot succeed on the merits of their substantive due process claim.[2]

### b.       Procedural Due Process

To establish a procedural due process claim, plaintiffs first must show that they had a constitutionally protected life, liberty, or property interest of which they were deprived. *Davenport v. Univ. of Ark. Bd. of Trs.*, 553 F.3d 1110, 1114 (8th Cir. 2009).   Again, for the reasons discussed above regarding substantive due process, the Court determines that plaintiffs have not shown a protected liberty interest of which they were deprived.

Plaintiffs also have not shown a protected property interest of which they were deprived. Generally, property interests are created by state law, not by the U.S. Constitution.   *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972) ("Property interests, of course, are not created by the Constitution.   Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or

---

[2]   The Court notes that plaintiffs purport to abandon their substantive due process claims in their trial brief (Dkt. No. 75).   Because that position was not made clear in the briefing on summary judgment, plaintiffs have filed no formal motion for voluntary dismissal of their substantive due process claim, and the BSD has moved for summary judgment on this claim, the Court has analyzed plaintiffs' substantive due process claim.

understandings that secure certain benefits and that support claims of entitlement to those benefits."). The Constitution protects a person's state-created property interest only if the person has a "legitimate claim of entitlement" under state law to that interest, not merely subjective expectancy. *Id.*

This Court acknowledges that the Supreme Court has recognized as a property interest a student's legitimate entitlement to a public education and that such a property interest may not be terminated for misconduct absent some minimum due process protection. *Goss v. Lopez*, 419 U.S. 565, 579 (1975). Specifically, the Supreme Court explained that a student facing interference with the protected property interest in public education "must be given some kind of notice and afforded some kind of hearing. . . . [T]he timing and content of the notice and the nature of the hearing will depend on appropriate accommodation of the competing interests involved." *Goss*, 419 U.S. at 579 (citations omitted). However, as with plaintiffs' claimed liberty interest, plaintiffs' claimed property interest exceeds that which the Supreme Court has recognized. In *Goss*, the interference with the protected interest in public education involved suspension of plaintiffs, which included "exclusion from the educational process." *Id.* Here, plaintiffs have not been excluded from the educational process. Moreover, the 2013 Act does not create a property interest in exercising public school choice because plaintiffs do not have more than a mere subjective expectancy of school choice under the 2013 Act. *Cf. Batra v. Bd. of Regents of Univ. of Neb.*, 79 F.3d 717, 720 (8th Cir. 1996) ("For a property interest to arise, a government employee must have a 'legitimate claim of entitlement' to continued employment, as opposed to a mere subjective expectancy."). Again, this is because the BSD lawfully claimed an exemption under the 2013 Act and, even if it had not, nonresident districts retained discretion on whether to accept students seeking to transfer.

Because plaintiffs have not shown a protected life, liberty, or property interest of which they were deprived, the Court determines that plaintiffs cannot succeed on the merits of their procedural due process claim.

### B.     Irreparable Harm

"To succeed in demonstrating a threat of irreparable harm, 'a party must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief.'"  *S.J.W. ex rel. Wilson v. Lee's Summit R-7 Sch. Dist.*, 696 F.3d 771, 778 (8th Cir. 2012) (quoting *Roudachevski v. All-Am. Care Ctrs., Inc*., 648 F.3d 701, 706 (8th Cir. 2011) (quoting *Iowa Utils. Bd. v. Fed. Commc'ns Comm'n*, 109 F.3d 418, 425 (8th Cir. 1996))). Plaintiffs argue that they would be irreparably harmed absent a permanent injunction by "being subjected to unlawful, violation of their state and federal statutory and constitutional rights" to participate in the process outlined in the 2013 Act (Dkt. No. 67, at 3).  However, plaintiffs have been deprived of no rights because, as discussed above, the BSD complied with the 2013 Act. The 2013 Act does not confer an absolute, unconditional right to transfer or even to apply for transfer.  Under certain circumstances, a resident district may declare, as the BSD did here, an exemption from the law.

### C.     Balance Of The Harm And Public Interest

The parties have not addressed these issues in their recent filings.  The Court declines to reach these issues, based on its analysis regarding success on the merits of plaintiffs' claims and the threat of irreparable harm.

**V.      Conclusions**

For the reasons above, the Court denies plaintiffs' motion for partial summary judgment and grants the BSD's counter-motion for summary judgment.   The Court denies plaintiffs' request for a declaration, permanent injunction, and damages.

SO ORDERED this the 2nd day of December, 2014.

_____
Kristine G. Baker
United States District Judge